IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TROYA INTERNATIONAL, LTD.
STI and HIKMET HEPBAYTAS,

                    Plaintiffs,                    Case No. 15 C 9785

          v.                                       Judge Harry D. Leinenweber

BIRD-X, INC.,

                    Defendant.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Combined Motion to Dismiss
Plaintiffs' Amended Complaint under Rule 12(b)(6) and Limited
Motion for Summary Judgment [ECF No. 49]. The parties briefed
these Motions concurrently, and so the Court issues the
following single Opinion granting in part and denying in part
Defendant's Combined Motion.

## I.  BACKGROUND

*"To see me does not necessarily mean to see my face.
To understand my thoughts is to have seen me."*
Mustafa Kemal Atatürk.

*"At the sight of blackbirds
Flying in a green light,
Even the bawds of euphony
Would cry out sharply."*
Wallace Stevens, *Thirteen Ways of Looking at a Blackbird*, X.

## A. The Parties' Commercial Relationship

This dispute took flight after dealings broke down between Plaintiff Troya International, Ltd. Sti. ("Troya") - a Turkish company owned by Plaintiff Hikmet Hepbaytas ("Hikmet") and his wife - and Defendant Bird-X, Inc. ("Bird-X"), an Illinois-based manufacturer of pest control products. As relevant, Bird-X develops and sells products designed to steer birds clear of airports, transit facilities, wind farms, power stations, and the like. Hikmet and his wife purchased Troya for the purpose of marketing and distributing Bird-X's bird control products in Turkey and Cyprus. The following factual background is drawn from the allegations in Plaintiffs' First Amended Complaint as well as the undisputed facts introduced on Bird-X's Limited Motion for Summary Judgment.

On August 10, 2001, Hikmet and Stephen Boyle ("Boyle"), an agent in Bird-X's export department, allegedly entered into an oral agreement whereby Bird-X granted Troya the exclusive right to market, sell, and otherwise distribute its products in Turkey and Cyprus for twenty years. (*See,* ECF No. 40 ("FAC") ¶¶ 18-20, 61.) The parties never reduced this agreement to writing, nor do any of their subsequent writings refer to this putative accord.

On October 28, 2002, Hikmet expressed to Boyle an interest in Troya's testing certain Bird-X products. (ECF No. 60 at Ex. A ("Pls.' Resp. to Def.'s SOF") ¶ 3.) After some back and forth, Boyle sent Hikmet a signed statement on December 27, 2002, on behalf of Bird-X, "authoriz[ing] Troya International Ltd. Sti. as the dealer of Bird-X, Inc. in Turkey, The Cyprus and Turki [*sic*] Republic, to distribute our products in these regions on a non-exclusive basis." (FAC at Ex. A.) Boyle represented that Bird-X would "refer appropriate leads from your area" in the following manner:

> When a customer from Turkey or the surrounding area contacts us, we can advise them to contact you directly. We will offer protection to you for your customers. We will not contact any of your customers directly without your consent. In order to achieve this, we will need you to provide us with a list of customers and prospects that you are working with so that we can re-direct them to you should they try to contact us directly.

(*Ibid.*) Plaintiffs proceeded under this business relationship with Bird-X, with Hikmet even turning over Troya's customer list – one of its "most valuable trade secrets" replete with "confidential" information that was otherwise "kept secret." (FAC ¶ 37.) In January 2003, Troya made its first purchase from Bird-X: three units totaling $950.00 (Pls.' Resp. to Def.'s SOF ¶ 5.) Around that time, Hikmet also wrote to Bird-X indicating that Troya wanted an "exclusive distributorship." (*Id.* ¶ 6.) In

response, Bird-X stated that Troya's securing such rights would depend on the extent of its future sales. (*Ibid.*)

In April 2003, Hikmet complained to Bird-X that another Turkish company was selling Bird-X products; about a year later, he expressed concern that Bird-X had sold products directly to other distributors in Turkey and indirectly to a Troya customer, Ataturk Airport. (Pls.' Resp. to Def.'s SOF ¶ 10.) On July 15, 2004, Hikmet again requested that Troya be recognized as Bird-X's exclusive distributor in Turkey and Cyprus. From Bird-X's response, Hikmet understood that Troya would need sales volume of $7,000-10,000 per month for Bird-X to consider granting exclusivity rights. (*Id.* ¶ 11.) When Hikmet again requested exclusivity on October 5, 2004, Boyle reiterated that Troya would need greater sales volume and also noted that Bird-X generally required exclusive distributors to stock products – something Troya did not do. (*Id.* ¶ 12.) On February 9, 2006, Hikmet emailed Bird-X again to express concern at Bird-X's direct sales to Aygaz, a Turkish company. (*Id.* ¶ 13.)

At Hikmet's request, Boyle signed and transmitted to Troya another written statement on November 2, 2007, authorizing Troya to distribute Bird-X's "products as our representative in Turkey and Cyprus" but omitting the "on a non-exclusive basis" language. (FAC at Ex. B; Pls.' Resp. to Def.'s SOF ¶ 15.) Like

the first, this signed letter promised "protection to you for your customers" and "not [to] contact any of your customers directly without your consent." (FAC at Ex. B.) The statement concluded by expressing excitement "to have Troya International as an official Bird-X agent in Turkey." (*Ibid.*) Hikmet understood this signed statement to grant exclusivity rights to Troya at long last. (*Id.* ¶ 27.)

Throughout 2008, Hikmet again realized "that other entities were selling Defendant's products in Turkey and Cyprus." (FAC ¶ 42.) In response to an inquiry from Hikmet, Bird-X personnel indicated that these other entities must have purchased the products online but reassured Hikmet that Bird-X "would continue to forward leads only to him, and would try to monitor further internet sales." (*Id.* ¶ 44; *see also, id.* at Ex. C.) Similarly, in September 2009, Hikmet emailed Bird-X complaining that other Turkish companies were presenting and selling Bird-X products on their websites, which "constituted a great problem for us." (Pls.' Resp. to Def.'s SOF ¶ 17.)

Troya placed its last order for Bird-X products in August 2010. (Pls.' Resp. to Def.'s SOF ¶ 30.) On March 2, 2011, Tammy Stone ("Stone"), Bird-X's international sales manager, informed Hikmet that Bird-X had entered into a master distributorship agreement with an Istanbul-based company, MG Gida. According to

Stone, that agreement granted MG Gida the exclusive rights to provide Bird-X products to all "existing distributors, dealers, retail customers and of course end users" in the region. (FAC at Ex. D.) Although Stone informed Hikmet that Troya could purchase Bird-X products from MG Gida at prices comparable to those it had directly paid Bird-X in the past, Plaintiffs claim that MG Gida's prices were actually 60 percent higher such that Troya was unable to sell Bird-X products for a profit. (*Id.* ¶¶ 47-49.) According to Plaintiffs, Bird-X gave Troya's customer list to MG Gida, which cost Troya "at least one major contract." (FAC ¶ 52.) Because they "are no longer able to benefit from the market that they created for Bird-X's products," Plaintiffs now only distribute local Turkish-made products. (ECF No. 63 at Ex. 2 ("Def.'s Resp. to Pls.' SAUF") ¶ 12.)

### B. Video Demonstration

As part of their efforts to market Bird-X products, Plaintiffs created TV and internet advertisements, including numerous videos demonstrating the efficacy of certain Bird-X products, and Hikmet traveled considerably to introduce the products to market and have them tested. Specifically, in 2006, Hikmet created a video in which he narrates and demonstrates the efficacy of the "BirdXPeller Sonic Device." Hikmet uploaded

this video to Troya's website, and Bird-X eventually uploaded the video to its own website. On September 4, 2009, Hikmet notified Bird-X via email that he and Troya "are glad that you shared our successful controlling dangerous pigeon test" and pointed Bird-X to other Troya-created content that could potentially help Bird-X market its products. (Pls.' Resp. to Def.'s SOF ¶¶ 22-24.) Plaintiffs admit that Hikmet was aware of Bird-X's use of the video on its own website in 2009. (*Id.* ¶ 22.) Sometime later, Bird-X uploaded the video to vimeo.com, metacafe.com, and youtube.com. (FAC ¶ 35.) Bird-X has also furnished the video to some of its other distributors for them to use in marketing Bird-X products. (*Id.* ¶ 34.)

Hikmet registered the video in his name with the U.S. Copyright Office on August 6, 2015, as U.S. Copyright No. PAu 3-773-067 entitled "Bird Repellant Demonstration of Product Effectiveness." (*See,* FAC ¶¶ 133-34; *id.* at Ex. E.) It was only upon filing this lawsuit that Hikmet requested that Bird-X remove the video from its website and otherwise cease using it in its marketing efforts. (Pls.' Resp. to Def.'s SOF ¶ 25.)

### C. The Turkish Lawsuits

Between 2004 and 2011, Troya was named as a defendant in five separate lawsuits relating to its sale of "faulty" Bird-X products in Turkey. (Pls.' Resp. to Def.'s SOF ¶ 26.) Troya

answered and sought to defend against the lawsuits, but judgments were ultimately entered against Troya in an amount exceeding $100,000. (*Id.* ¶ 27; FAC ¶¶ 55-56.) At no time prior to filing the instant lawsuit did Troya notify Bird-X of the Turkish lawsuits or of any of the judgments entered against it. (Pls.' Resp. to Def.'s SOF ¶¶ 28-29.)

\* \* \*

Plaintiffs filed their original Complaint in this case on November 2, 2015, claiming that Bird-X fraudulently induced them to spend their own time and money to distribute and market its products throughout Turkey and Cyprus. On January 31, 2017, Plaintiffs amended to assert the following: common law fraud (Count I), breach of fiduciary duty (Count II), tortious interference with contract (Count III), contribution (Count IV), breach of contract (Count V), trade secret misappropriation (Count VI), violation of Hikmet's right of publicity (Count VII), copyright infringement (Count VIII), and two counts pled in the alternative: *quantum meruit* (Count IX) and unjust enrichment (Count X). After taking limited discovery on statute-of-limitations issues, Bird-X filed its Combined Motion to Dismiss and Motion for Limited Summary Judgment, arguing that certain of Plaintiffs' counts are time-barred or should be dismissed for various other pleading deficiencies.

## II.  **LEGAL STANDARDS**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must state a claim that is plausible on its face." *Adams v. City of Indianapolis,* 742 F.3d 720, 728 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  When considering motions to dismiss under Rule 12(b)(6), a district court accepts as true all well-pleaded factual allegations and draws reasonable inferences therefrom in favor of the non-moving party. *See, e.g., Jakupovic v. Curran,* 850 F.3d 898, 902 (7th Cir. 2017). Documents attached to the Complaint are considered part of it. *See, e.g., Moranski v. Gen. Motors Corp.,* 433 F.3d 537, 539 (7th Cir. 2005) (citing FED. R. CIV. P. 10(c)).

Rule 56 of the Federal Rules of Civil Procedure provides for the entry of summary judgment against a plaintiff who fails to make a sufficient showing of the existence of an element essential to its case and on which it will bear the burden at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  To obtain summary judgment on an affirmative defense, a defendant must establish the defense's essential elements. *See, e.g., Wilson v. Epps,* 776 F.3d 296, 299 (5th Cir. 2015).  Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex,* 477 U.S. at 322-23.   A genuine issue of material fact exists when the evidence, viewed in the light most favorable to the non-movant, is such that a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## III. DISCUSSION

Because the statute-of-limitations issues on which the Court granted limited discovery will dispose of claims, the Court will consider Bird-X's arguments concerning pleading inadequacies only once and after it determines that a particular claim is not time-barred.

### A. Count I: Common Law Fraud

Count I alleges common law fraud based upon Bird-X agents' alleged statements "through at least 2008" that Troya had or would secure exclusive rights to distribute Bird-X products in the region and assurances "through at least November 2, 2007" that Bird-X would not sell to Troya's customers. (FAC ¶¶ 58-73.) Plaintiffs allege that Bird-X's non-solicitation assurances were designed "to induce Plaintiffs to give them Troya's valuable customer list," and that Plaintiffs relied on them in so doing. (*Id.* ¶ 71.)   Plaintiffs allege damages "well in excess of

$1,500,000" as a result of Bird-X's conduct and ultimate establishment of an exclusive distributorship arrangement with MG Gida. (*Id.* ¶¶ 78-79.)

The parties agree that Count I is governed by Illinois's five-year residual statute of limitations for actions "not otherwise provided for." 735 Ill. Comp. Stat. 5/13-205. This limitations period begins to run when Plaintiffs knew or reasonably should have known that an injury had occurred and that it was wrongfully caused. *Compare, In re marchFIRST Inc.,* 589 F.3d 901, 904 (7th Cir. 2009) ("The cause of action accrues and the limitations period begins to run when 'the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved.'" (quoting *Knox College v. Celotex Corp.,* 430 N.E.2d 976, 980-81 (Ill. 1981)), *with, Chicago Bldg. Design, P.C. v. Mongolian House,* 770 F.3d 610 (7th Cir. 2014) ("The concept of inquiry notice may help to identify the time at which a reasonable plaintiff can be expected to start investigating a possible violation of his rights, but it does not itself trigger the statute of limitations.").

On a regular basis between 2003 and 2009, Hikmet was made aware that Troya was not an exclusive distributor and that Bird-

X was selling to other parties in Turkey. For example, Troya discovered on April 16, 2004, that Bird-X was selling to other companies in Turkey, including Troya customer Ataturk Airport. What is more, on February 9, 2006, Troya emailed Bird-X expressing concern that it had directly sold products to another Turkish company, Aygaz, and at that time was also aware "of several such instances of direct sales by Bird-X." (Pls.' Resp. to Def.'s SOF ¶ 13.) Although Boyle's November 11, 2007 signed letter to Troya omitted the "on a non-exclusive basis" caveat that characterized his prior signed statement, nothing therein can be construed to suggest that Bird-X told Troya it had or would soon be entitled to exclusivity rights. As stated previously, Bird-X had repeatedly told Hikmet that Troya would need to both increase its sales volume by several orders of magnitude and stock Bird-X products for exclusivity even to be on the table; it is undisputed that Troya never met either benchmark prior to the November 11, 2007 letter. And, in any event, on September 4, 2009, Troya notified Bird-X that other Turkish companies were presenting and selling Bird-X products on their websites, meaning that Plaintiffs knew or reasonably should have known in 2009 that whatever exclusivity promises they derived from the November letter were not being honored.

In sum, Bird-X's consistent course of conduct contradicted the very representations on which Plaintiffs claim to have reasonably relied when they earlier chose to market Bird-X's products and turn over Troya's customer list. Bird-X's only potential deviation – an ambivalent November 2007 letter – flew in the face of Bird-X's repeated insistence that Troya would not even be eligible for exclusivity rights unless it met benchmarks that it indisputably never did. And, in any event, Troya learned in 2009 that the non-exclusivity *status quo* persisted insofar as other Turkish companies were peddling Bird-X products on their websites. Plaintiffs therefore knew or reasonably should have known that Troya was not an exclusive distributor of Bird-X products in the region and that Bird-X was selling its products to other companies in Turkey (as well as Troya's own customers) long before November 2, 2010 – that is, long before five years prior to initiating this lawsuit. As such, Count I is time-barred, and Bird-X's Motion is granted in relevant part.

Finally, to the extent Plaintiffs premise Count I on Bird-X's alleged misappropriation of Troya's customer list – which Plaintiffs seem to allege occurred in 2011 upon Bird-X's establishment of an exclusivity arrangement with MG Gida – such a claim for relief would be preempted. As set forth more fully below, Troya states an actionable state law claim based on Bird-

X's alleged misappropriation of Troya's customer list. (*See,* Section III.F, *infra.*) The Illinois Trade Secrets Act ("ITSA") is the exclusive remedy under Illinois law for misappropriation of trade secrets and "explicitly abolishes all common law causes of action, except breach of contract, predicated on a trade secret theory." *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir. 1992). As such, to the extent it invokes Bird-X's alleged trade secret misappropriation within the limitations period, Count I alleging common law fraud is preempted.

## B. Count II: Breach of Fiduciary Duty

Next, Plaintiffs claim that Bird-X stood in the position of a fiduciary by virtue of "a significant disparity in business experience between the parties." (FAC ¶¶ 82-84.) Accordingly, "Troya entrusted Defendant with its confidential customer list, and with handling its customer related business affairs and questions" and credited Bird-X's representations that it would "direct all potential leads from Turkey and Cyprus to Troya." (*Id.* ¶ 85.) And because Plaintiffs allege that they played an integral role in making a market in Turkey and Cyprus for Bird-X's products, "Plaintiffs were entirely at the mercy of Defendant, who at any time could terminate their relationship and take advance of this market for its own benefit." (*Id.*

¶ 86.) Plaintiffs posit three breaches of Bird-X's fiduciary "duty of good faith and fair dealing and duty of loyalty": "intentionally sabotaging Troya's exclusive distributorship, and forcing them to buy a product at a markup from MG Gida"; "disclosing Troya's confidential customer list"; and "failing to reimburse Troya" for the five lawsuits in which judgment was entered against Troya. (*Id.* ¶¶ 88-90.)

As with claims of common law fraud, claims for breach of fiduciary duty under Illinois law are subject to the residual five-year statute of limitations specified in 735 Ill. Comp. Stat. 5/13-205. *See, Havoco of Am., Ltd. v. Sumitomo Corp. of Am.,* 971 F.2d 1332, 1337 (7th Cir. 1992); *Armstrong v. Guigler,* 673 N.E.2d 290, 296 (Ill. 1996) (holding that "only the five-year statute of limitations for all civil actions not otherwise provided for is truly consonant with the distinctive characteristics of [the breach of fiduciary duty] cause of action"). The limitations period for such actions is "measured from the accrual of the cause of action," *Clark v. Robert W. Barid Co.,* 142 F.Supp.2d 1065, 1074-75 (N.D. Ill. 2001), meaning that the limitations period begins to run when "'the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved.'" *Uppal v.*

*Rosalind Franklin Univ. of Med. and Sci.,* No. 15 C 3806, 2015 WL
5062823, at *2 (N.D. Ill. Aug. 26, 2015) (quoting *Knox College,*
430 N.E.2d at 980-81).

The Court need not reach the question whether Bird-X owed
any fiduciary duties because, to the extent Plaintiffs had any
claim for breach of fiduciary duty, it accrued long before
November 2010 – that is, long before five years prior to
initiation of this lawsuit.

First, Plaintiffs try to link the other features of their
breach of fiduciary duty claim to their discovery that Bird-X
had entered into a master distributorship agreement with MG Gida
in March 2011 – the only relevant event falling within the
statute of limitations. But Plaintiffs have alleged the
breaches in such a way that, at best, the MG Gida arrangement
merely culminated Bird-X's prior consistent acts, of which
Hikmet was aware, of "sabotaging Troya's exclusive
distributorship arrangement" and "disclosing Troya customer
information." In other words, Bird-X is not alleged to have
done anything with respect to MG Gida concerning Troya's
customers that Plaintiffs were not already aware of with respect
to Bird-X's supplying other Turkish product distributors and
selling to other Troya customers. Because breach of fiduciary
duty is not a tort in Illinois, but instead is governed by the

law of contract and agency, *see, In re marchFIRST,* 589 F.3d at 904-05; *Kinzer on behalf of City of Chi. v. City of Chi.,* 539 N.E.2d 1216, 1220 (Ill. 1989), Bird-X's conduct with respect to MG Gida is not a continuing violation that re-starts the clock on Plaintiffs' claim that Bird-X breached its fiduciary duty to protect Troya's "exclusive distributorship" or "customers." *See, e.g., In re marchFIRST,* 589 F.3d at 904; *Uppal,* 2015 WL 5062823, at \*3; *In re Nat'l Jockey Club,* 451 B.R. 825, 832 (Bankr. N.D. Ill. 2001) ("The continuing violation doctrine does not apply to Plaintiff's breach of fiduciary duty claim."); *Hassebrock v. Ceja Corp.,* 29 N.E.3d 412, 421 (Ill. App. 2015).

Independently, Plaintiffs' claim for breach of fiduciary duty insofar as it relates to disclosure of Troya's customer list is preempted by their actionable ITSA claim. (*See also,* Section III.A, *supra.*) Where a claim for breach of fiduciary duty cannot conceivably "state a claim for disloyalty without implicating trade secrets," it is preempted by the ITSA. *AutoMed Techs., Inc. v. Eller,* 160 F.Supp.2d 915, 921-22 (N.D. Ill. 2001) ("Breaching a duty of loyalty by using confidential information is still misappropriation of a trade secret."); *accord, Montel Aetnastak, Inc. v. Miessen,* 998 F.Supp.2d 694, 719 (N.D. Ill. 2014) ("The ITSA preempts civil claims that are based on the misappropriation of trade secrets. Valid claims

involving the misuse of non-confidential information, such as theft, fraud and breach of the duty of loyalty, are not preempted.") (internal citation omitted).

Second, it is clearly too late for a fiduciary duty claim based on Bird-X's failure to reimburse Troya for its liability to dissatisfied customers. Plaintiffs admit that the five Turkish lawsuits in which judgments were entered against Troya based on defective Bird-X products were filed beginning in 2004. Only the 2011 lawsuit falls within the limitations period, and by all accounts it was identical to the other previous suits – making it also a mere continuing violation insufficient to restart the clock.

As such, Count II for breach of fiduciary duty is time-barred, and the Court grants Bird-X's Motion in relevant part.

## C. Count III: Tortious Interference with Contract

Next, Plaintiffs allege that, from 2001 through March 2011, Troya had contracts with third parties throughout Turkey and Cyprus to sell and install Bird-X products and that "these agreements ceased and Troya's business stopped" "after Defendant's breach." (FAC ¶¶ 93, 95, 97.) By forcing Troya to purchase Bird-X products at a markup from MG Gida and "by giving Troya's confidential client list to MG Gida," Bird-X forced Troya's former customers to be "serviced by MG Gida and

- 18 -

Defendant's other distributors." (*Id.* ¶ 96.) Plaintiffs aver Bird-X's knowledge of Troya's contracts by pointing to Bird-X's possession of Troya's customer list, filling Troya's orders for these clients, and repeatedly communicating with Hikmet regarding sales and marketing. (*Id.* ¶ 98.)

In Illinois, actions for tortious interference with contract are also "not otherwise provided for" and thus subject to the five-year residual statute of limitations. 735 Ill. Comp. Stat. 5/13-205. A claim for tortious interference with contract accrues when the interfered-with contract is breached. *Hi-Lite Prods. Co. v. Am. Home Prods. Corp.,* 11 F.3d 1402, 1410 (7th Cir. 1993) (citing *Howard T. Fisher & Assocs., Inc. v. Shinner Realty Co.,* 164 N.E.2d 266, 272 (Ill. App. 1960)). This is so even if the tortious conduct prompting the third party's breach continues beyond it, as "there can be [no] continuing procuring of a breach of a contract after the breach has actually occurred." *Ibid.*

Even if their allegations indicate that Plaintiffs were aware of Bird-X's propensity to sell to Troya's customers long before November 2, 2010 – that is, long before five years prior to the filing of this action - Plaintiffs also allege that Bird-X tortiously interfered with Troya's contracts by establishing an exclusivity arrangement with MG Gida, forcing Troya to

purchase products from MG Gida at a markup, and turning over Troya's customer list to that company. Bird-X informed Hikmet of its arrangement with MG Gida on March 2, 2011 — well within the limitations period — suggesting that Troya's customers did not breach their contracts until sometime later. As such, Plaintiffs allege tortious interference falling within the limitations period, and Count III is actionable on that basis even though some interference with its customer relationships may have occurred outside the limitations period. *See, Hi-Lite,* 11 F.3d at 1410-11. However, Count III is time-barred to the extent it seeks to recover for third-party breaches prior to November 2, 2010, induced by Bird-X's allegedly tortious conduct. (Per the Court's earlier analysis, Count III is also preempted by the ITSA insofar as it is bottomed on alleged misappropriation of Troya's customer list.)

There still remains the issue of various pleading deficiencies Bird-X has asserted under Rule 12(b)(6), the most well-taken of which is its assertion, consonant with Illinois law, that liability for tortious interference "may only be premised on acts immediately directed at a third party *which cause that party to breach its contract with the plaintiff.*" *George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.,* 719 F.2d 1326, 1330 (7th Cir. 1983) (citing *Mitchell v. Weiger,* 409

N.E.2d 38 (Ill. App. 1980)). Although certain of Bird-X's alleged dealings were directed at customers of Troya, Plaintiffs' only actionable, timely claim against Bird-X for tortious interference concerns Bird-X's post-November 2, 2010 conduct (other than trade secret misappropriation) with respect to MG Gida. But Plaintiffs do not allege that MG Gida was a Troya customer, nor that Bird-X took any action within the limitations period directed at a Troya customer that induced such a customer to breach its contract with Troya. As a general proposition of Illinois tortious interference law, "[i]t is not enough for the defendant's action to impact a third party; rather, the defendant's action must be directed towards the third party." *Boffa Surgical Grp. LLC v. Managed Healthcare Assocs., Ltd.,* 47 N.E.3d 569, 577 (Ill. App. 2015) (citation omitted). Courts have consistently "require[ed] that the interfering action be directed in the first instance at the third party." *Schuler v. Abbot Labs.,* 639 N.E.2d 144, 148 (Ill. App. 1993).

Perhaps if Plaintiffs had sued MG Gida for tortious interference based on its improperly inducing customers to breach their contracts with Troya, then there would be no such impediment. Yet they chose to bring this tortious interference action against Bird-X as the sole defendant. "Alas, the frailty

is to blame, not we / For such as we are made of, such we be."
*Twelfth Night*, Act II, Scene II.  Consequently, Bird-X's Motion
is granted in relevant part as to Count III.

### D.  Count IV: Contribution

Plaintiffs next sue Bird-X under the Illinois Contribution
Among Joint Tortfeasors Act ("the Contribution Act"), 740 Ill.
Comp. Stat. 100/0.01, *et seq.*, based on the five Turkish
lawsuits against Troya arising out of "Defendant's faulty bird
repellant products." (FAC ¶¶ 101, 106.)  As a result of these
suits, judgments in excess of $100,000 were entered against
Troya without any contribution from Bird-X. (*Id.* ¶¶ 102-04).
Plaintiffs also claim that Troya was forced to refund $10,000 to
one of its customers as a result of a faulty Bird-X product.
(*Id.* ¶ 105.)  Plaintiffs neither respond to Bird-X's statute-of-
limitations arguments nor posit any acts or omissions (other
than the initiation of these Turkish suits) that alerted them to
their entitlement to contribution from Bird-X.

The Contribution Act provides for a right of contribution
among two or more persons subject to liability in tort arising
out of the same injury to person or property. 740 Ill. Comp.
Stat. 100/2.  If "no underlying action seeking recovery
. . . has been filed by a claimant, no action for contribution
or indemnity may be commenced with respect to any payment made

- 22 -

to that claimant more than 2 years [after the payment]." 735
Ill. Comp. Stat. 5/13-204(a). Where "an underlying action" has
been filed by a claimant," under Illinois law no contribution or
indemnity action "may be commenced more than 2 years after the
party seeking contribution or indemnity has been served with
process in the underlying action or more than 2 years from the
time the party . . . knew or should reasonably have known of an
act or omission giving rise to the action for contribution or
indemnity, whichever period expires later." 735 Ill. Comp. Stat.
5/13-204(b).

The claim by a Turkish consumer resulting in Troya's
payment of a $10,000 refund constitutes the "payment" made
absent an underlying action. And the Turkish lawsuits that
eventuated in judgments against Troya of over $100,000 are the
"underlying actions" for which Plaintiffs seek contribution.
Regardless of whether these claims sounded in tort (as
Plaintiffs seem to allege by pleading the cause of action under
the Contribution Act) or contract (as Plaintiffs' suggest in
their briefs), Count IV is time-barred because Troya brought it
more than two years (indeed, at least four years) after the last
of the five lawsuits was filed against it. Even the most recent
payment for which Plaintiffs have sued Bird-X – the 2012 refund
– necessitated filing of a contribution action no later than

2014.  As such, the Court grants Bird-X's Motion in relevant part with respect to Count IV.

### E.  Count V: Breach of Contract

Count V explicitly rests on an alleged contract under which Bird-X "offered protection for Plaintiffs' business and customers in valuable consideration for Troya's confidential customer list." (FAC ¶ 109.)  Plaintiffs contend that this agreement was reduced to writing on several occasions, including in the December 27, 2002 signed letter. (*Id.* ¶ 110; ECF No. 61 at 9 ("The terms of the parties' rather straightforward agreement are laid out in the December 27, 2002 statement.").) In that document, Bird-X promised to Troya to "refer appropriate leads from your area," "offer protection to you for your customers," and "not contact any of your customers directly without your consent". (FAC at Ex. A.)  "In order to achieve this," Bird-X represented, "we will need you to provide us with a list of customers and prospects that you are working with so that we can re-direct them to you should they try to contact us directly." (*Ibid.*)  Plaintiffs assert that their "breach of contract claim is solely predicated upon Bird-X's broken promise to protect Plaintiffs' customers and forward new customer leads in Turkey directly to Plaintiffs, which they gave in valuable consideration for Troya's customer list and efforts in building

a market for Bird-X's products." (ECF No. 61 at 8.) Plaintiffs allege on information and belief that Bird-X breached this agreement by giving Troya's customer list to MG Gida. (*Id.* ¶ 111.) Bird-X moves for summary judgment, arguing that the applicable statute of limitations bars this claim.

Yet Plaintiffs also seem to allege "oral contract terms." First, although expressly contradicted by the December 27, 2002 letter, Plaintiffs claim that Bird-X promised "an oral exclusive distributorship agreement whereby Defendant granted Troya the sole and exclusive right to market, sell, and otherwise distribute its products in Turkey and Cyprus." (FAC ¶ 18.) Second, Plaintiffs assert that "Troya's sole distributorship rights would expire in 2020 with the option to renew the relationship with both parties' consent." (FAC ¶¶ 19-20.) The parties agree that they never exchanged a signed writing that provides for an exclusivity arrangement. Bird-X moves to dismiss any such claim for breach of an oral exclusivity agreement under Rule 12(b)(6) based on the statue of frauds and a lack of definiteness as to essential terms.

Illinois law imposes a 10-year statute of limitations on actions for breach of written contract. *See,* 735 Ill. Comp. Stat. 5/13-206. The statute of limitations on unwritten contracts, however, is only five years. 735 Ill. Comp. Stat.

5/13-205.  An action for breach of contract accrues when the breach of contractual duty occurs.  *See, e.g., Ind. Ins. Co. v. Machon & Machon, Inc.,* 753 N.E.2d 442, 445 (Ill. App. 2001). Nevertheless, contracts requiring continuing performance are capable of being partially breached on numerous occasions.  *See, Hi-Lite,* 11 F.3d at 1408; *Luminall Paints, Inc. v. La Salle Nat'l Bank,* 581 N.E.2d 191, 194-95 (Ill. App. 1991).  Each partial breach of a contract requiring continuous performance is actionable and subject to its own accrual date and limitations period.  *See, Hi-Lite,* 11 F.3d at 1408-09; *Luminall Paints,* 581 N.E.2d at 195; *Thread and Gage Co., Inc. v. Kucinski,* 451 N.E.2d 1292, 1296-97 (Ill. App. 1983).  Even a continuous contract is capable of "a single total breach by repudiation or a material failure of performance."  *Segall v. Hurwitz,* 339 N.W.2d 333, 342-43 (Wis. App. 1983).  A breach is material if it is "so substantial and fundamental as to defeat the objects of the parties in making the agreement." *Insureone Ind. Ins. Agency, LLC v. Hallberg,* 976 N.E.2d 1014, 1027 (Ill. App. 2012) (internal quotation marks omitted).

First, to the extent Count V asserts breach of an oral contract based on Bird-X not treating Troya as an exclusive distributor, such a claim is time-barred because Hikmet knew of Bird-X's total breach by repudiation of the alleged agreement

long before November 2, 2010 – that is, long before five years prior to institution of this lawsuit. The December 27, 2002 signed letter contravened the alleged prior oral exclusivity arrangement by expressly providing that Troya was a Bird-X dealer endowed only with "non-exclusive" distribution rights; Bird-X declined on numerous occasions from 2003 to 2005 to grant exclusivity rights to Troya, stating that it would only consider an exclusivity arrangement if Troya attained certain benchmarks that it indisputably never did; and in 2009, even after the November 2, 2007 signed letter, Hikmet continued to complain to Bird-X about the availability of its products through multiple other Turkish companies. Thus, even reading the Complaint with Troya-tinted glasses leads inexorably to the conclusion that recovery on the alleged oral exclusivity contract is time-barred. Prior to November 2, 2010, Bird-X repeatedly expressed to Hikmet that exclusivity was off the table and engaged in conduct to the same effect, thus materially breaching or totally repudiating any alleged oral exclusivity contract. *See, Hi-Lite,* 11 F.3d at 1409 ("If a single breach [of a continuous contract] occurs, either by repudiation or material failure of performance, the claim accrues at that time and the statute of limitations begins to run for all claims on that contract."); *Hassebrock v. Ceja Corp.,* 29 N.E.3d 412, 422-23 (Ill. App. 2015)

("[E]ven if we were to construe the venture agreement as constituting a continuous-performance contract as the plaintiff suggests, the statute of limitations began to run when the total breach occurred. As previously noted, the plaintiff was fully aware of the defendant's total breach. . . .").

However, as laid out above, the gravamen of Plaintiffs' currently styled breach-of-contract count is that Bird-X breached its *written* promise to protect Troya's customers, which served as the consideration for Hikmet giving Troya's customer list to Bird-X. The actions constituting Bird-X's alleged breach appear to implicate conduct occurring both before and after November 2, 2005 – particularly, the alleged sharing of Troya's customer list with MG Gida. The question is whether such contractual claims are time-barred.

If the written contractual duties Bird-X undertook were not continuous, then the statute of limitations for all such breaches would begin running on the date of the first breach – for example, the 2003 sales of Bird-X products by other Turkish companies to Troya's customers or Bird-X's own sales in 2004 to Troya customer Ataturk Airport. If, however, Bird-X undertook continuous duties, then – absent "a single total breach by repudiation or material failure of performance," *Hi-Lite,* 11 F.3d at 1409 - each claimed Bird-X breach has a separate accrual

date such that those alleged to have occurred after November 2, 2005, are actionable.

The Court finds that Bird-X undertook continuous contractual duties when it agreed in writing to "protect" Troya's customers, to "refer appropriate leads from your area," and to refrain from "contact[ing] any of your customers directly without your consent." Although there is no bright-line rule for determining when contractual duties are continuous, several data points in the case law persuade the Court at this early stage that Bird-X's duties were indeed continuous. *See, e.g., Rexam Beverage Can Co. v. Bolger,* No. 06 C 2234, 2008 WL 217114, at *5 (N.D. Ill. Jan. 22, 2008) (holding that lease agreement created continuing obligations on part of landlord to keep premises in good condition, order, and repair); *Lee v. Allstate Life Ins. Co.,* 838 N.E.2d 15, 23 (Ill. App. 2005) (finding insurer's ongoing duty to abide by terms of its contracts with customers continuous, such that plaintiffs' claims were not barred by 10-year limitations period even though initial breach was outside period); *Hurwitz,* 339 N.W.2d at 342-43 (holding that covenant not to compete imposes continuing duties upon defendant such that new claim generally accrues for each separate breach); *cf., DNB Fitness, LLC v. Anytime Fitness, LLC,* No. 11 C 4892, 2012 WL 1952662, at *3 (N.D. Ill. May 30, 2012) ("Here, the

wrongful conduct alleged is Anytime's failure to disclose the Anytime Health fee policy prior to the execution of the franchise agreements, not the failure to disclose the Anytime Health fee each month prior to it being charged. Therefore the failure to disclose is a one-time breach and does not constitute conduct that Anytime was expected to perform on an ongoing basis."); *Terra Eng'g & Const. Corp. v. Camp Dresser & McKee, Inc.,* No. 03 C 582, 2010 WL 2901606, at *7 (N.D. Ill. July 21, 2010) ("The contract did not call for [defendant] to maintain 'a series of performances over a period of time,' such as a contract to 'maintain and keep in repair roads, fences, and buildings, to give a railway pass for life, to furnish heat, to refrain from competition in business, and to supply another for life with ice for his own use.'") (citing 4 Corbin on Contracts § 956 (1951)).

What is more, the Court finds that Bird-X did not commit a single total breach of its continuing contractual duties, materially fail to perform them, or repudiate them when, prior to November 2, 2005, another company in Turkey apparently sought to sell Bird-X products to Troya's customers in Ankara and Istanbul, nor when Bird-X sold its products indirectly to Ataturk Airport. *See, e.g., Apex Dig., Inc. v. Sears, Roebuck & Co.,* 735 F.3d 962, 966 (7th Cir. 2013) (holding that each

invoice deduction constitutes a separate breach); *B/P Servs., Inc. v. Target Corp.,* No. 16 C 4403, 2017 WL 4180301, at *2 (N.D. Ill. Sept. 21, 2017) ("The Court can find no support for the proposition that failure to timely pay a single invoice in an ongoing relationship is a total breach of contract such that further breaches should be uncompensated. . . . Like excess rents, periodic taxes, or failure to place orders, each failure to pay an invoice was an independent breach with its own statute of limitations."); *Teague v. Teague,* 847 F.Supp.2d 1120, 1124 (N.D. Ill. 2012) ("[E]ach refusal or failure to provide documents on Henry's part constituted another breach of the Assignment Agreement."); *Int'l Bus. Lists, Ltd. v. Am. Tel. & Tel. Co.,* No. 92 C 5844, 1994 WL 285079, at *4 (N.D. Ill. June 23, 1994) (finding that, if company breached its contract "every time it failed to order a certain number of leads," each of those failures would be separate breach with its own statute of limitations); *Luminall Paints,* 581 N.E.2d 191, 194 (failure to pay excess rents due at specified intervals a separate breach). Indeed, rather than expressly repudiating its contractual duties, Bird-X through Boyle sought to explain away the two pre-November 2, 2005 issues that directly impacted Troya's customers, reassuring Hikmet that "I have agreed to protect your business based on the efforts that you have made.

Any inquiries that have reached us due to the advertising that you have done have been referred back to you, and we will continue to do this." (ECF No. 50 ("Def.'s SOF") at Ex. 3, BirdX000021-22.)

Because any prior breaches of Bird-X's continuous duties were mere partial breaches, Troya's breach-of-contract claim is not time barred insofar as it relates to post-November 2, 2005 instances of Bird-X contacting Troya customers directly, neglecting to re-direct them to Troya when they contacted Bird-X, disclosing Troya's customer list, and otherwise failing to "protect" Troya's customers. *See, Hi-Lite,* 11 F.3d at 1409-10.

The only issue remaining is whether Bird-X is entitled to a Rule 12(b)(6) dismissal based on pleading deficiencies. Specifically, Bird-X argues that Plaintiffs have not set forth essential terms of the written contract – such as quantity, price, or duration – with sufficient definiteness. (Bird-X's unenforceability arguments with regard to the alleged 20-year oral exclusivity contract will not be examined here, as the Court has determined that any associated contract claim is time-barred.)  The question, then, is whether the December 27, 2002 signed letter and subsequent associated written promises impart sufficiently definite contract terms at the pleading stage to

state a claim for breach of contract based on Bird-X's failure to protect Troya's customers.

The Court declines Bird-X's invitation to find the alleged contract terms too indefinite to state a claim, as the parties have only had an opportunity to discover facts relevant to statute-of-limitations defenses. First, and contrary to Bird-X's argument, courts typically find indefiniteness only after full summary judgment on the merits. *See, e.g., Ryan v. Wersi Elecs. GmbH & Co.,* 3 F.3d 174, 181-82 (7th Cir. 1993) (holding on summary judgment that letter did not adequately express substance of distribution contract with reasonable certainty inasmuch as it reflected no sales quota or durational terms); *Bell Fuels, Inc. v. Chevron U.S.A., Inc.,* No. 99 C 2586, 2000 WL 305955, at *5 (N.D. Ill. Mar. 21, 2000) (holding on summary judgment that alleged exclusive distributorship agreement failed for lack of essential terms by omitting sales quantity information). And, in any event, because Plaintiffs concede the necessity of looking beyond the signed letters to establish Troya's purported exclusive distribution rights, the written agreement at issue may not constitute a distribution contract *per se* - but instead may be more accurately characterized as an agency or marketing agreement. This is a particularly distinct possibility in light of Troya's market-making activities and its

persistent wish to retain the customers that had inured to it by dint of its efforts in the region. Moreover, both parties were willing to enter into and reap the benefits of the written contract at issue despite Troya's coming up short on Bird-X's standard requirements for exclusive distributors – maintaining a stock of Bird-X products or delivering on sales quotas. For these reasons, the hallmarks of an enforceable distribution agreement, even if applicable at the pleading stage, may be a poor fit for the contract here. Absent discovery into the substance of the claim and an opportunity for full briefing on the issue, whether the signed letters and associated written communications are sufficiently definite to ground Plaintiff's timely breach-of-contract claim is best left for the merits stage.

Thus, Bird-X's Motion is granted as to breach of the alleged oral exclusivity contract but denied as to breach of the written agreement promising protection for Troya's customers. Troya's action for breach of contract may proceed along the contours described herein.

## F.  Count VI: Trade Secret Misappropriation

With respect to the trade secret misappropriation claim under 765 Ill. Comp. Stat. 1065/1 *et seq.* ("the ITSA"), Plaintiffs allege that Troya's "confidential customer list was a

'trade secret' in that it was sufficiently secret to derive
economic value from not being generally known to other
distributors in the region, and because Plaintiffs made
reasonable efforts under the circumstances to keep it secret."
(FAC ¶ 115; *see, id.* ¶ 37.)   In Plaintiffs' telling, Bird-X
obtained Troya's customer list by improper means – namely, by
misrepresenting to Plaintiffs that it needed the list to enable
it to "protect" Troya's customers – and then misappropriated the
list by disclosing it "[a]t some point" to MG Gida without
consent. (*Id.* ¶¶ 52, 116-17; *see, id.* ¶¶ 38-41.)   Plaintiffs
claim that Troya lost "at least one major contract to MG Gida"
as a result of Bird-X's misappropriation. (*Id.* ¶ 52.)   Bird-X
does not argue that Count VI is untimely but instead attacks
various pleading deficiencies via Rule 12(b)(6).

To prevail on a claim for misappropriation of a trade
secret under the ITSA, the plaintiff must demonstrate that the
information at issue was a trade secret, that it was
misappropriated, and that it was used in the defendant's
business. *See, Learning Curve Toys, Inc. v. PlayWood Toys,
Inc.,* 342 F.3d 714, 721 (7th Cir. 2003); *see also, Alpha Sch.
Bus Co. v. Wagner,* 910 N.E.2d 1134, 1152 (Ill. App. 2009).   The
statute defines a "trade secret" as:

> information, including but not limited to, technical
> or non-technical data, a formula, pattern,

compilation, program, device, method, technique, drawing, process, financial data, or *list of actual or potential customers or suppliers*, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. 1065/2(d) (emphasis added); *see, Triumph Packaging Grp. v. Ward,* 834 F.Supp.2d 796, 806 (N.D. Ill. 2011).

Bird-X argues for dismissal primarily on the grounds that Count VI is "devoid of allegations bearing on plaintiff's efforts to maintaining [*sic*] the confidentiality of the trade secrets." (ECF No. 62 at 10.) Courts in this district, however, consistently find trade secret "allegations to be adequate in instances where the information and the *efforts to maintain its confidentiality are described in general terms.*" *Covenant Aviation Sec., LLC v. Berry,* 15 F.Supp.3d 813, 818 (N.D. Ill. 2014) (collecting cases) (emphasis added); *see also, Scan Top Enter. Co., Ltd. v. Winplus N. Am., Inc.,* No. 14 C 7505, 2015 WL 4945240, at *3 (N.D. Ill. Aug. 19, 2015) ("At the pleading stage, plaintiffs need only describe the information and efforts to maintain the confidentiality of the information in general terms."). To Bird-X's related claim that the Complaint's trade secret allegations are "intentionally vague and opaque" in

neglecting to identify customers, the Court responds that Troya need not identify its customers at this stage "'for the simple reason that such a requirement would result in public disclosure of the purported trade secrets.'" *Covenant Aviation,* 15 F.Supp.3d at 818 (quoting *AutoMed,* 160 F.Supp.2d at 921). Indeed, courts only dismiss a misappropriation claim for lack of specificity "in the most extreme cases." *Fire 'Em Up, Inc. v. Technocarb Equip. Ltd.,* 799 F.Supp.2d 846, 850 (N.D. Ill. 2001) (citation omitted).

No such extreme circumstances are present here, and the allegations suffice to state a claim. First, with respect to the secrecy prong, "[e]xamples of information that often fulfills the ITSA's secrecy requirement include[s] 'customer lists that are not readily ascertainable.'" *Traffic Tech, Inc. v. Krieter,* No. 14 C 7528, 2015 WL 9259544, at *11 (N.D. Ill. Dec. 18, 2015) (quotation omitted). The documents attached to the Complaint make clear that Troya had taken at least some steps to preserve the confidentiality of the customer list and that it was not readily ascertainable; why else would Bird-X have expressly asked Troya for the list and explained the necessity of disclosure, as Boyle did in Bird-X's December 27, 2002 letter? In any event, "whether a customer list constitutes a trade secret depends upon factual issues that cannot be

decided at the pleading stage, including the amount of effort expended to develop the list and the steps taken to keep it secret." *Lane v. Brocq,* No. 15 C 6177, 2016 WL 1271051, at *13 (N.D. Ill. Mar. 28, 2016) (collecting cases).

Second, any lack of specificity regarding misappropriation is particularly benign from the perspective of fair notice here, "especially because the only relationship the parties had was collaborating" on sales of Bird-X products in Turkey. *Mission Measurement Corp. v. Blackbaud, Inc.,* 216 F.Supp.3d 915, 922 (N.D. Ill. 2016). And other allegations make it exceedingly likely that the customer list flowed from Hikmet to Bird-X through Boyle. After all, Boyle signed the December 27, 2002 letter requesting Troya's customer list and appears to have been Hikmet's primary contact at Bird-X for several ensuing years. These facts governing the parties' relationship mitigate the concerns of fair notice that might in other instances favor more detailed allegations regarding both Troya's efforts to maintain the list's secrecy and Bird-X's alleged misappropriation.

Consequently, Bird-X's Motion is denied in relevant part. Troya, as the owner of the alleged trade secret, may pursue Count VI against Bird-X.

**G. Count VII: Violation of Hikmet's Right of Publicity**

In Count VII alleging violation of the Illinois Right of Publicity Act, 765 Ill. Comp. Stat. 1075/1 *et seq.* ("IRPA"), Hikmet claims that Bird-X willfully and for commercial purposes exploited his likeness in a film that depicts Hikmet using a Bird-X product to cause multiple flocks of birds to vacate "the outside of the Piyale Pasta factory building in Izmir, Turkey." (FAC ¶¶ 120-21, 130.) Hikmet asserts that the video shows his face and body, and contains audio of his narration. (*Id.* ¶ 122.) Bird-X uploaded the video to its own website, various YouTube channels, and other websites "without permission and after Defendant refused to honor its exclusive distributorship agreement with Troya." (*Id.* ¶ 123.) Hikmet alleges that Bird-X also distributed the video to other Turkish and Cypriot vendors of its products. (*Id.* ¶ 124.) Bird-X now principally uses the video to reach new markets, according to Hikmet. (*Id.* ¶¶ 127-28.) Bird-X argues that Hikmet's claim is time-barred but does not otherwise identify any deficiencies of Hikmet's claim.

IRPA grants to each individual the "right to control and to choose whether and how to use [his or her] identity for commercial purposes," and prohibits use of "an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent." 765

Ill. Comp. Stat. 1075/10, 1075/30. The statute of limitations
on an IRPA claim is one year from the date the cause of action
accrued. *See, Martin v. Wendy's Int'l, Inc.*, 183 F.Supp.3d 925,
929-30 (N.D. Ill. 2016); *Blair v. Nevada Landing Partnership,*
859 N.E.2d 1188, 1192, 1195-96 (Ill. App. 2006) (citing 735 Ill.
Comp. Stat. 5/13-201); *Benitez v. KFC Nat'l Mgmt. Co.,* 714
N.E.2d 1002, 1007 (Ill. App. 1999) (explaining that one-year
statute of limitations in 735 Ill. Comp. Stat. 5/13-201 applies
to tort of appropriation of likeness). A cause of action under
IRPA typically accrues on the date when the allegedly infringing
publication was first published. *See, e.g., Martin v. Living
Essentials, LLC,* 160 F.Supp.3d 1042, 1045 (N.D. Ill. 2016)
("IRPA claims . . . begin[] to accrue at the time of the first
publication of the allegedly infringing publication.") (citing
*Blair,* 859 N.E.2d at 1192), *aff'd,* 653 Fed.Appx. 482 (7th Cir.
2016).

Bird-X contends that Hikmet failed to bring his IRPA claim
within the statute of limitations because he admitted to knowing
that Bird-X posted the video on its website in 2009 and thus
long before November 1, 2014 – that is, long before one year
prior to the date on which Plaintiffs brought this action. (*See,*
Pls.' Resp. to Def.'s SOF ¶¶ 22.) Hikmet responds that Bird-X
engaged in continuing violations of his publicity rights that

re-started the clock every time it republished the video on, for example, YouTube or disseminated the video to its distributors.

While true that, under the continuing violation doctrine, a limitations period does not begin to run until the date of the last injury or the date the tortious acts cease, "where there is a single overt act from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature of the injury." *Blair,* 859 N.E.2d at 1193. In *Blair,* the plaintiff consented to participate in a photo shoot conducted by his employer with knowledge that the photographs were to be used for promotional purposes. After the plaintiff resigned, his former employer continued to use a photograph taken at the shoot. In the plaintiff's suit for violation of his right to publicity, the appeals court held that republication of the plaintiff's picture without consent did not trigger the continuing violation doctrine, but instead "that the use of the plaintiff's picture in different means such as on the billboard in the casino pavilion, in the casino's restaurant menu, and on the defendants' website, constituted a single overt act." *Ibid.* Integral to the court's analysis was the fact that the plaintiff's picture "was used for a single purpose, to

advertise the Buckingham Steakhouse, and targeted a single audience, casino patrons." *Ibid.*

The rationale articulated in *Blair* applies here. As that court noted, "'the first time that an offending item is published, the one-year statute of limitations . . . begins to run and the dissemination of that same offending item thereafter does not give rise to a new cause of action, nor does it refresh the running of the statute of limitations.'" *Blair,* 859 N.E.2d at 1194 (quoting *Zoll v. Jordache Enters., Inc.,* No. 01 C 1339, 2002 WL 31873461, at *7 (S.D.N.Y. Dec. 24, 2002) (citation omitted); *see also, Founding Church of Scientology of Washington, D.C. v. Am. Med. Ass'n,* 377 N.E.2d 158, 160 (Ill. App. 1978) (holding that privacy actions are "complete at the time of the first publication, and any subsequent appearances or distributions of copies of the original publication are of no consequence to the creation or existence of a cause of action, but are only relevant in computing damages"). Regardless of the different media or websites Bird-X exploited to display Hikmet's video, its republication of the video was intended to promote "a single product" (Bird-X), used for a single purpose (showing that Bird-X products work), and accompanied by no significant alterations of the video to reach a new audience. *See, e.g., Living Essentials,* 160 F.Supp.3d at 1046 n.4 ("[T]he Court notes

that the repeated airing of the Commercial still constitutes a single overt act, such that the limitations period does not toll.") (citing *Blair,* 859 N.E.2d at 1193); *cf., Maremont v. Susan Fredman Design Grp., Ltd.,* 772 F.Supp.2d 967, 971-72 (N.D. Ill. 2011) (distinguishing *Blair* and applying the continuing violation rule where the plaintiff "alleged that Defendants continually invaded her interest by *impersonating her in multiple Posts and Tweets discussing different aspects of interior design*" for over two years) (emphasis added). Hikmet's allegation that Bird-X is now using the video to attempt to reach new markets does not bear on when his right-to-publicity claim accrued, because Hikmet knew in 2009 that the video was hosted on Bird-X's website and thus viewable to any of its prospective customers the world over. *Blair,* 859 N.E.2d at 1194 ("[T]he purpose of the use of the photograph on the website was the same as the purpose of its use in the other mediums around the casino: to attract casino customers to dine at the Buckingham Steakhouse.").

Two facets of this case distinguish *Berry v. Ford Modeling Agency,* No. 09 C 8076, 2010 WL 1930154 (N.D. Ill. May 13, 2010), on which Hikmet relies to argue against a finding that his claim is time-barred. *See, id.* at *4 ("Plaintiff's complaint alleges numerous republications of her image, and because she gets the

benefit of reasonable hypotheticals at the motion to dismiss phase, she has not pled herself out of court.") (internal citation omitted). First, *Berry* involved a *pro se* plaintiff and the attendant solicitous construction of *pro se* complaints required under *Erickson v. Pardus,* 551 U.S. 89 (2007). Here, Hikmet is represented by counsel. Second, the statute-of-limitations issue in *Berry* was raised as an affirmative defense via a motion to dismiss without the benefit of any discovery on the issue. Such is not the case here, and the Court does not rest its conclusion that Hikmet's claim is time-barred on the pleadings but instead on the limited statute-of-limitations discovery it has allowed.

Hikmet's claim for violation of his right to publicity accrued in 2009 when (Hikmet contemporaneously knew that) Bird-X uploaded his product demonstration video to its website. Accordingly, Count VII is time-barred by more than four years, and Bird-X's Motion is granted in relevant part. (This conclusion is equally true regardless of whether a one-year or a five-year statute of limitations applies to Hikmet's claim, because Bird-X first published the video at issue in 2009. *See, Living Essentials,* 653 Fed.Appx. at 486 (reiterating the Seventh Circuit's persistent refusal "to decide if *Blair* is correct about the [one-year] statute of limitations").)

## H. Count VIII: Copyright Infringement

In Count VIII, Hikmet sues Bird-X for infringing his copyright in the same video that is the subject of his right-to-publicity claim. Hikmet alleges that Bird-X displayed the video on various third-party websites and used the video in its marketing efforts without his permission or authorization. (*Id.* ¶¶ 34-36, 137.) It is undisputed that Hikmet was aware of Bird-X's use of the video on its own website in 2009. Bird-X makes essentially the same argument here as it did with respect to Count VII, arguing that the claim is time-barred because subsequent republications of the video did not restart the limitations period. (Bird-X does not otherwise identify any pleading deficiencies supporting dismissal under Rule 12(b)(6).)

Under the Copyright Act, "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer." 17 U.S.C. § 501(a). Among the exclusive rights secured to a copyright owner are the rights to reproduce the copyrighted work in copies, to prepare derivative works based on the copyrighted work, and to distribute copies of the work to the public by sale or other transfer of ownership. *See, id.* § 106. The statute also provides that "[n]o civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A copyright claim

ordinarily accrues, and the limitations period begins to run, when the plaintiff learns or should as a reasonable person have learned that the defendant was violating his rights. *Gaiman v. McFarlane,* 360 F.3d 644, 653 (7th Cir. 2004); *see also, Petrella v. Metro-Goldwyn-Mayer, Inc.,* 134 S.Ct. 1962, 1969 n.4 (2014) ("Although we have not passed on the question, nine Courts of Appeals have adopted . . . a discovery rule, which starts the limitations period when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.") (citations and internal quotation marks omitted).

This three-year statute of limitations is subject to a "separate-accrual rule" whereby each distinct infringing act starts a new limitations period. When a defendant commits successive violations, the statute of limitations runs separately from each violation. *Petrella,* 134 S.Ct. at 1969. "Each time an infringing work is reproduced or distributed, the infringer commits a new wrong" that gives rise to a new claim with a separate limitations period. *Ibid.* However, each infringement is actionable only within three years of its occurrence. *Id.* at 1969-70 ("Thus, when a defendant has engaged (or is alleged to have engaged) in a series of discrete infringing acts, the copyright holder's suit ordinarily will be

- 46 -

timely under § 507(b) with respect to more recent acts of infringement (*i.e.,* acts within the three-year window), but untimely with respect to prior acts of the same or similar kind."). What is more, "[s]eparately accruing harm" sufficient under § 507(b) to restart the clock "should not be confused with harm from past violations that are continuing." *Id.* at 1969 n.6 (citations omitted); *see also, Mongolian House,* 770 F.3d at 614-15 (finding the continuing-violation doctrine inapplicable to the Copyright Act's three-year statute of limitations).

The question, then, is whether Hikmet seeks redress for continuing harm to his copyright interests based on violations that may have extended into the limitations period or for a series of discrete successive harms. *See, Mongolian House,* 770 F.3d at 616 ("[I]n light of *Petrella,* we now know that the right question to ask in copyright cases is whether the complaint contains allegations of infringing acts that occurred within the three-year look-back period from the date on which the suit was filed."). If the harm within the limitations period from Bird-X's alleged distribution and display of Troya's copyrighted work was of a piece with that occurring before November 2, 2012 (three years prior to filing of this action), then Count VIII is time-barred. *See, e.g., Wolf v. Travolta,* 167 F.Supp.3d 1077, 1099 & n.13 (C.D. Cal. 2016) ("Travolta avers that the main

version of the allegedly infringing program service guide was published on the Inclusion Films website in or about 2010, where it remained without substantial revisions until it was removed in response to this litigation. [T]he allegedly infringing document's continued presence on defendants' website through 2014 at best constitutes harm from a past violation that was continuing through 2014, and not a new wrong that gave rise to separately accruing harm within the limitations period.") (alterations, brackets, and internal quotation marks omitted); *Alfa Laval Inc. v. Flowtrend, Inc.,* No. Civ. H-14-2597, 2016 WL 2625068, at *6 (S.D. Tex. May 9, 2016) ("There is no evidence that Defendant[] engaged in new acts of copyright infringement after it originally posted the Copyrighted Materials on its website, which occurred by 2009. . . . Absent later independent acts of copyright infringement by Defendants, the 'separate-accrual' rule does not extend the limitations period.") (citing *Petrella,* 134 S.Ct. at 1970). If, however, Bird-X's conduct constituted successive violations that caused separately accruing harm to Troya, then Count VIII is timely as to any infringing conduct alleged to have occurred on or after November 2, 2012. *See, e.g., Fischer v. Forrest,* No. 14 C 1304, 2017 WL 128705, at *7 (S.D.N.Y. Jan. 13, 2017) ("Fischer asked defendants to cease their infringement in April 2011, but

Defendants refused, and continued their infringement by displaying Fischer's copyrighted works online. Fischer has plausibly alleged that the infringement starting in March 2011 was the beginning of a longer course of action by defendants that has not ended.") (internal citations and quotation marks omitted). What Hikmet alleges Bird-X did on or after November 2, 2012, is integral.

Alas, the Complaint furnishes no detail on what, if any, of the alleged acts of infringement Bird-X committed within the three-year look-back period. Similarly, the Complaint does not indicate when Hikmet learned of his video's presence on third-party websites or its use by other distributors. What's discernible from the allegations and the limited discovery obtained thus far points to Bird-X uploading the video to its website in 2009 (with, at the very least, Hikmet's knowledge of the same in 2009) and then, at some point later in time, disseminating the video to other distributors as well as posting the video on three third-party websites. The only potential inflection point Plaintiffs provide – March 2011, when Hikmet learned the bad news about MG Gida - still leaves a 20-month window (until November 2012) during which Bird-X may have committed all, some, or none of the alleged acts of infringement.

As the summary judgment movant, Bird-X bears the initial burden of establishing that Hikmet's copyright claim is time-barred based on the undisputed facts. Because neither the facts adduced nor the briefs speak to the relevant question after *Petrella,* Bird-X has not carried its initial burden to prove its statute-of-limitations affirmative defense. Discovery will ferret out the specific acts of infringement, if any, that Bird-X actually committed within the limitations period. On this record, Hikmet has alleged potentially infringing acts that occurred within the three-year look-back period from the date of suit, and thus Bird-X's Motion is denied in relevant part.

## I.  Counts IX and X: *Quantum Meruit* and Unjust Enrichment

Plaintiffs plead their final two counts as alternatives to their breach-of-contract claim. Apart from incorporating their prior allegations, Plaintiffs principally complain that Troya and Hikmet performed distributing, marketing, and advertising services for Bird-X from 2001 through 2007 throughout Turkey, the benefits of which Bird-X accepted without fully compensating them. (FAC ¶¶ 139-41, 144-45.) With respect to the unjust enrichment count, Plaintiffs allege that Bird-X obtained the benefits of their services "through fraudulent, deceptive, wrongful, or unlawful conduct" – namely, Bird-X's representations that they would enjoy exclusive distribution

rights in Turkey and Cyprus. (*Id.* ¶ 146.) "After Plaintiffs had secured a market for Defendant's products, and after Defendant obtained copies of Hikmet's video demonstrations, Defendant disavowed Plaintiffs [*sic*] exclusivity and drove them out of that market." (*Ibid.*) Bird-X contends that these counts are time-barred and that, even if they are timely, they suffer from pleading deficiencies fatal under Rule 12(b)(6).

The residual five-year statute of limitations in Illinois applies to quasi-contractual remedies, such as *quantum meruit* and unjust enrichment claims. 735 Ill. Comp. Stat. 5/13-205; *see, e.g., Burns Philp Food, Inc. v. Cavalea Continental Freight, Inc.,* 135 F.3d 526, 528 (7th Cir. 1998) (applying five-year residual statute of limitations to unjust enrichment claim); *Gregg v. SR Investors, Ltd.,* 966 F.Supp. 746, 749 (N.D. Ill. 1997) (applying five-year residual statute of limitations to plaintiff's *quantum meruit* claim).

There is some tension between two strands of case law concerning when a quasi-contractual cause of action accrues. On the one hand, many Illinois courts hew to the principle that "[a] cause of action on an oral contract or on a *quantum meruit* theory accrues when the services are completed." *Toll Processing Servs., LLC v. Kastalon, Inc.,* No. 12 C 10058, 2014 WL 1379676, at *3 (N.D. Ill. Apr. 8, 2014) (citing *P-K Tool & Mfg. Co. v.*

*Gen. Elec. Co.,* 612 F.Supp. 276, 278 (N.D. Ill. 1985)); *see also, Rohter v. Passarella,* 617 N.E.2d 46, 52-53 (Ill. App. 1993) ("If no time is fixed as to when such labor and services were to be paid for, the law would presume that they were to be paid for at the end of that year.") (internal quotation marks and alterations omitted). On the other, the Seventh Circuit has applied the discovery rule to the limitations period for quasi-contract actions, keying accrual of the cause of action to when the injury could have been discovered through exercise of appropriate diligence. *Burns Philp,* 135 F.3d at 528.

Under either theory of accrual, however, Plaintiffs' claims are time-barred. Applying the first to the allegations renders Plaintiffs' final two counts untimely by some three years: if, as Plaintiffs plead, they performed services "from 2001 through 2007," then any quasi-contract claims seeking recovery for those services brought after 2012, such as Counts IX and X in this suit, are untimely.

Nor does the discovery rule advance the ball for Plaintiffs. As explained earlier in this Opinion, Plaintiffs' claim for breach of an alleged oral exclusivity contract is barred by the same residual five-year statute of limitations because, at the very least, appropriate diligence on the part of Plaintiffs would have made clear long before November 2, 2010

that Troya was not an exclusive distributor of Bird-X products in the region. At the heart of Counts IX and X is remuneration for services that Plaintiffs claim was denied them, but that compensation is formulated in terms of the monetary benefits Plaintiffs would otherwise have enjoyed by virtue of being an exclusive distributor. (*See, e.g.,* FAC ¶ 146 ("Plaintiffs conferred this benefit based on Defendant's representations that Plaintiffs would be an exclusive distributor in Cyprus and Turkey.").) Missing are any allegations that Plaintiffs were promised some sort of fee for services or were compensated for their services in the form of anything other than revenue on Bird-X sales to Turkish and Cypriot customers. Yet, long before Plaintiffs learned of MG Gida's ascension to exclusivity in 2011 and well in advance of November 2, 2010 – from the earliest indications that Bird-X was selling products into Turkey, including to one of its own customers, up through its last order of products in August 2010 – Hikmet was concerned that Bird-X's own selling activity was steadily eroding Troya's revenue on sales of Bird-X products, and thus the remuneration for Plaintiffs' services. Accordingly, long before November 2, 2010, Plaintiffs knew, or by the exercise of reasonable diligence should have known, that they had no exclusivity rights and that they were otherwise suffering the same injury

underlying Counts IX and X. *Burns Philp,* 135 F.3d at 528 ("A firm's delay in taking such a routine precaution [that would have discovered the injury] is not a good reason to extend the period of limitations; the costs of a firm's carelessness are not so readily shifted.").

Bird-X's Motion is therefore granted in relevant part as to Counts IX and X.

## IV.   CONCLUSION

For the reasons stated herein, Defendant's Combined Motion to Dismiss Plaintiffs' Amended Complaint under Rule 12(b)(6) and Limited Motion for Summary Judgment [ECF No. 49] is granted in part and denied in part. Defendant's Motion is granted as to Counts I, II, III, IV, VII, IX, and X. Defendant's Motion is granted in part as to Count V; Plaintiff Troya may only pursue a claim for breach of Defendant's written contract to protect Troya's customers. Defendant's Motion is denied as to Troya's Count VI and Hikmet's Count VIII.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: December 7, 2017